NATURAL RESOURCES DEFENSE COUNCIL, Environmental Defense, Plaintiffs,

v.

Donald EVANS, in his capacity as Secretary of Commerce; the National Oceanic and Atmospheric Administration; and the National Marine Fisheries Service, Defendants.

No. 01 Civ. 9453(RMB).

United States District Court, S.D. New York.

March 31, 2003.

Bradford Sewell, NY, for Natural Resources Defense Council.

Monica Goldberg, Washington, DC, for Oceana.

Beth Goldman, U.S. Atty's Office, New York City.

David Frulla, Brand & Frulla, P.C., Washington, DC, for Donald Evans, Joel MacDonald, MA.

### DECISION AND ORDER

BERMAN, District Judge.

## I. Introduction

In this action, filed October 26, 2001, Natural Resources Defense Council and Environmental Defense ("Plaintiffs"), nonprofit environmental membership organizations, seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the tilefish Fishery Management Plan ("FMP")—that is, a plan to conserve tilefish resources— issued by Donald Evans, in his capacity as Secretary of Commerce ("Secretary"), The National Oceanic and Atmospheric Administration and The National Marine Fisheries Service ("Nat'l Marine Fish. Serv."), (collectively, "Defendants") violated the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson Act"), 16 U.S.C. §§ 1801 to 1883, the National Environmental Policy Act ("Nat'l Envtl. Policy Act"), 42 U.S.C. §§ 4321 to 4370f, and the Administrative Procedure Act ("Admin.Proced.Act"), 5 U.S.C. §§ 551 to 559; 701 to 706. Plaintiffs claim that Defendants wrongly refused to limit the use of "bottom-tending mobile gear" to protect tilefish habitat and that the Environmental Impact Statement ("Envtl.Imp.Stmt.") included in the FMP is inadequate.[1] Defendants respond that there is no evidence that bottom-tending mobile gear causes an "identifiable adverse effect" upon tilefish habitat and that the Envtl. Imp. Stmt. satisfies all statutory requirements. **For the reasons set forth below, the Court denies Plaintiffs' motion for summary judgment and grants Defendants' cross motion for summary judgment.**

## II. Background

The Magnuson Act of 1976 established a statutory framework to conserve and manage fishery resources. 16 U.S.C. §§ 1801 to 1883. The Act creates eight regional councils to represent the interests of the various states in each region, *id.* at § 1852, including the Mid–Atlantic Fishery Management Council ("Mid–Atl. Fish. Mgmt. Council" or the "Council"), which created the FMP at issue. The Secretary staffs the regional councils with individuals who have knowledge of conservation and management of fish resources based upon their occupational experience or scientific expertise. *Id.* at § 1852(b)(2)(A). Each regional council develops and implements FMPs for the management and conservation of fisheries. *Id.* at § 1852. After a council develops an FMP, the Secretary, acting through the Nat'l Marine Fish. Serv., determines whether the FMP complies with the Magnuson Act and other applicable laws. *Id.* at § 1854. The Secretary then publishes a notice in the Federal Register that the FMP is available for comment from interested parties during a sixty-day comment period. *Id.* Within thirty days of the end of the comment period, the Secretary approves, disapproves or partially approves the FMP. *Id.* Congress amended

---

**1.** Bottom-tending mobile gear is a category of fishing device, such as the otter trawl, which uses metal boards to hold open a net towed behind a fishing boat. AR1929–31. (AR — refers to pages in the Administrative Record.)

the Magnuson Act in 1996 by enacting the Sustainable Fisheries Act which requires that FMPs identify and describe "essential fish habitats" to "minimize to the extent practicable adverse effects on such habitat caused by fishing." *Id.* at § 1853(a)(7).

The Nat'l Envtl. Policy Act provides that federal agencies must include a detailed statement of the environmental impact of any proposal the agency plans to implement. 42 U.S.C. § 4332. Council on Environmental Quality regulations require that Envtl. Imp. Stmts. "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14.

In 1998, the Nat'l Marine Fish. Serv. declared tilefish (Lopholatilus chamaeleonticeps) to be overfished, thus triggering the need for an FMP.[2] AR1386. The Mid–Atl. Fish. Mgmt. Council issued a draft tilefish FMP and Envtl. Imp. Stmt. in May 1999 for comment. AR825. The draft considered, among other things, the impact of bottom-tending mobile gear on tilefish habitat and, despite the paucity of evidence in respect of adverse effects on tilefish habitat, stated:

> Based on the best available scientific information, it can be **inferred** that trawling is causing long-term physical adverse impacts to tilefish EFH [i.e., "essential fish habitat"]. It is further **implied** that in some cases those adverse impacts may be severe, at least locally. AR870(citations omitted)(emphasis added).

The draft FMP cited studies of the impact of bottom-tending mobile gear on other (i.e., non-tilefish) habitats. AR868–70. The draft recommended changes to the use of bottom-tending mobile gear. AR843.

The draft FMP gave rise to a great deal of comment. *See* AR1289, 2486, 2528. For example, the Northeast Fisheries Science Center challenged the draft FMP's inference, stating that "[t]he use of shallow water examples of possible gear effects to biogenic habitat is misleading." AR1069. Public hearings in Rhode Island, New York and New Jersey gave rise to the following reactions: "Emerson Hasbrouck (Cornell), ... a port agent from 1975 through 1988 ... disagree[d] with conclusion [sic] specifically for tilefish. Assumed impacts to tilefish are not relatable." AR1115. Bonnie Aripotch commented that "[t]here is no science for 'tilefish.'" AR1117. Fisherman Dan Farnham argued that "gear impacts are not specifically identified for tilefish" and that "[t]he best tilefish landings occur where bottom gear is fished heavily." AR1093, 1111. Maggie Raymond, a representative of Garden State Seafood and other organizations, commented that the Council should research the gear impacts on tilefish habitats before implementing the draft FMP or "[t]here will be lost revenues with this alternative." AR1112, 1094. Fisherman Joe Nolan believed the conclusions in the draft "would destroy historic fishermen." AR1116, 1093. Likewise, Kevin Maguire asked the Council "not [to] put people out of business," AR1117, and Diana Weir commented that the "'flawed' plan ... will decimate our Montauk fisherman." AR1121. In contrast, Sonja Fordham from the Center for Marine Conservation stated "that a precautionary approach is warranted for such a long-lived, slow-growing, habitat-dependent species, that's in such an overfished state. We recognize

---

2. The facts herein are from the administrative record and the undisputed statements in the parties' Local Civil Rule 56.1 Statements.

that data on specific—the specific association are [sic] not strong." AR1296–97, 1122, 1116.

Commenters who opposed the "inference" that bottom-tending mobile gear negatively impacts tilefish habitat generally based their arguments on the lack of available evidence. AR1092–95, 1111–17, 1135. Commenters who supported the inference generally sought a precautionary approach, that is, limiting or banning the use of bottom-tending mobile gear despite the lack of evidence of its effects on tilefish habitat. AR1296–97, 1381, 1873, 2338; *see also* AR1252.

Interested parties, including Dr. Ken Able, a recognized expert on tilefish, AR1224, 1252, representatives from the Nat'l Marine Fish. Serv. and Mid–Atl. Fish. Mgmt. Council, and others met in September 1999 as a working group to discuss, among other things, bottom-tending mobile gear's impact on tilefish habitat. AR1196, 1224, 1252. Dr. Able was "unaware of any work on the east coast that would address gear impact questions for tilefish. . . . Theoretically, trawls could pass over the burrows without destroying them or could potentially cause sediments to fill the burrows. Able ha[d] not seen evidence of burrows filled in by trawls in his submersible work." AR1196. In short, no scientific data existed which proved a negative impact on tilefish habitat, according to Dr. Able. AR1196–99. The Mid–Atl. Fish Mgmt. Council acknowledged that they lacked evidence for their opinion that bottom-tending mobile gear had an adverse impact on tilefish habitat. AR1203, 1224–25, 1297, 1873.

At an October 14, 1999 meeting of the Mid–Atl. Fish. Mgmt. Council, the chairman of the Council stated that "what [Dr. Able] said and what the rest of the researchers concluded was that there really is nothing definitively known on tilefish gear or on bottom tending gear impacting tilefish habitat. . . . We can make all the associations we want, but we don't have any direct evidence. There's nothing in the literature. He knows of nothing." AR1224.

At a November 1999 meeting of the Mid–Atlantic Fish. Mgmt. Council, one staff member noted that "the conclusion of the working group was that nothing definitively was known directly about tilefish being directly impacted by bottom tending mobile gear. There is nothing direct in the literature. Unquestionably, trawl gear-patterns are found in tilefish burrows. . . . What the working group and the tilefish technical team now is recommending is that there not be gear impact measures in this FMP at this time, that there be a research approach." AR1289. A Council member noted: "The fact is there is no evidence as to what mobile gear does. It's not that there isn't much. **There isn't any** . . . . We simply have no information to justify . . . the proposals we went out to public hearing with. **We just had nothing**." AR1297 (emphasis added). Consequently, the Council voted to "eliminate the recommendation [from the draft FMP] to close ocean areas to protect tilefish habitat from supposed impact from mobile gear at this time." AR1299. Rather, the Council approved a plan to implement a research program to study the impact of bottom-tending mobile gear on tilefish habitat within two years. AR1322–24, 1382, 1903.

The Council submitted the revised tilefish FMP and Envtl. Imp. Stmt. to the Nat'l Marine Fish. Serv. in March 2000. AR1387, 1894. The final FMP states:

It was concluded that there is nothing definitively known about tilefish-mobile fishing gear interactions. There is nothing specifically described about the sensitivity of tilefish burrows in the scientific literature. Unquestionably, from

submersible vessel research, there are trawl door patterns observed in areas with tilefish burrows, but how much of an impact the doors have and how quickly tilefish can reopen their burrows, if sediment closed, is completely unknown at this time.... **[I]mpacts of bottom tending mobile gear specifically to tilefish habitat are unquantifiable at this time.** AR1903(emphasis added).

The Secretary approved the FMP on May 10, 2001. AR2527.

Based on the adverse economic effects that a prohibition on the use of bottom-tending mobile gear in tilefish HAPC would have upon several other fisheries and on the lack of scientific evidence showing identifiable adverse effects caused by such gear on tilefish EFH, the Council did not propose gear prohibitions in the HAPC on other than limited access tilefish vessels.

. . .

NMFS and the Council support a cooperative research program to further investigate this issue. AR2528.

### III. Standard of Review

A court may grant summary judgment if "the pleadings ... show that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Marvel Characters, Inc. v. Simon,* 310 F.3d 280, 285–86 (2d Cir.2002); *Vt. Pub. Interest Research Group v. United States Fish & Wildlife Serv.,* 2:01–CV–332, 2002 WL 32050312, at *3 (D.Vt. Sept.13, 2002). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party, who "must set forth specific facts showing

that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Brass v. American Film Techs., Inc.,* 987 F.2d 142, 146 (2d Cir.1993); *Natural Res. Def. Council, Inc. v. Fox,* 30 F.Supp.2d 369, 379 (S.D.N.Y.1998). The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. When cross-motions for summary judgment are made, the standard is the same as that for individual motions for summary judgment. *See Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir.2001); *Vt. Pub. Interest Research Group,* 2002 WL 32050312, at *3. The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party. *Morales,* 249 F.3d at 121.

■ Courts must use the standard set forth in Admin. Proced. Act, 5 U.S.C. § 706(2), when reviewing FMPs. 16 U.S.C. § 1855(f)(1)(B). Action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" should be set aside. 5 U.S.C. § 706(2)(A). "Review under this provision is 'narrow,' limited to examining the administrative record to determine 'whether the [agency] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Natural Res. Def. Council, Inc. v. Muszynski,* 268 F.3d 91, 97 (2d Cir.2001)(alteration in original)(quoting *New York v. Shalala,* 34 F.3d 1161, 1167 (2d Cir.1994)). **The agency's action is presumed valid.** *New York v. Evans,* 162 F.Supp.2d 161, 166 (E.D.N.Y.2001)("Under this standard, '[c]ourts must defer to the action taken by

the agency, which is presumed to be valid.'"); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)("[A] court is not to substitute its judgment for that of the agency."); *Muszynski,* 268 F.3d at 97 (same). At the same time, courts must conduct "a thorough, probing, in-depth review," *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and may not "stand aside and rubberstamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *see Chemung County v. Dole,* 781 F.2d 963, 970 (2d Cir.1986).

## IV. Analysis

There has been ample briefing of the issues presented. The Court has reviewed Plaintiffs' Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Pl.Br.") and Plaintiffs' Statement of Material Facts, dated February 22, 2002; Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross–Motion for Summary Judgment ("Def.Br.") and Response to Plaintiffs' Rule 56.1 Statement and Counter–Rule 56.1 Statement in Support of Defendants' Cross–Motion, dated March 20, 2002; Plaintiffs' Reply in Support of Their Motion for Summary Judgment and Opposition to Defendants' Cross–Motion

and Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts, dated April 12, 2002; and Defendants' Reply Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment and in Support of Cross–Motion for Summary Judgment, dated April 29, 2002. There has also been an *Amicus Curiae* submission in support of Defendants' cross-motion for summary judgment, dated April 4, 2002, which the Court has reviewed.[3] On March 27, 2003, the Court heard argument from the parties and *Amicus Curiae.*[4]

Plaintiffs claim that (i) Defendants wrongly concluded that bottom-tending mobile gear does not cause an identifiable adverse effect on tilefish habitat; and (ii) the Envtl. Imp. Stmt. included in the tilefish FMP was inadequate. The Court addresses these claims in turn.

### (i) Effects of Bottom–Tending Mobile Gear

Plaintiffs advance a number of arguments to support their claim that Defendants acted arbitrarily in concluding that bottom-tending mobile gear does not have an identifiable adverse effect on tilefish habitat. Plaintiffs argue that Defendants ignored evidence of physical disruption to tilefish habitat, which is an adverse effect; that Defendants failed to explain their change in position from the draft FMP to the final one; and that Defendants wrongly declined to act without definitive proof, among other things.

Defendants respond that Plaintiffs have not established physical disruption to tilef-

---

**3.** Defendants requested that the Court strike exhibits to and portions of Plaintiffs' reply brief, arguing that courts should generally confine their review to the administrative record, *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), except in limited circumstances not present here, *New York v. Shalala,* 93CIV1330, 1996 WL 87240, at *5 (S.D.N.Y. Feb.29, 1996). The objected to ex-

hibits and portions of the brief would not have changed the Court's decision.

**4.** At oral argument, the Court also heard helpful comments from Laurie Nolan, representing the Montauk Tilefish Association, Daniel Furlong, Executive Director of the Mid.-Atl. Fish. Mgmt. Council and Sima Freierman, General Manager of Montauk Inlet Seafood.

ish habitat, and even if they had, physical disruption does not necessarily reduce "quality or quantity of essential fish habitat," as required by the regulations under the Magnuson Act and that Defendants changed their position based on the best scientific information available, i.e., the "absence of *any* evidence that trawl gear is actually causing any adverse effects to the [essential fish habitat], as defined by the regulations." Def. Br. at 14.

The implementing regulations for the Magnuson Act provide that "Councils must act to prevent, mitigate, or minimize any adverse effects from fishing, to the extent practicable, if there is evidence that a fishing practice is having an identifiable adverse effect on [essential fish habitat]." [5] 50 C.F.R. § 600.815(a)(3)(iii). Section 600.810(a) defines "adverse effect" as "any impact which reduces quality and/or quantity of [essential fish habitat]. Adverse effects may include direct (e.g., contamination or physical disruption), indirect (e.g., loss of prey, or reduction in species' fecundity), site-specific or habitat-wide impacts." *Id.* at § 600.810(a). "Identifiable" means "both more than minimal and not temporary in nature." 62 Fed.Reg. 66,531, 66,538 (Dec. 19, 1997). To make the adverse effect determination, "[c]ouncils should use the best scientific information available." 50 C.F.R. § 600.815(a)(3)(ii).

■ Ample record evidence—including, among other things, the comments and reports of academics and fishing industry representatives—establishes clearly that the Defendants arrived at the conclusion that no identifiable adverse effects on tilefish essential fish habitat from bottom-tending mobile gear exists upon a rational analysis of the best scientific information available. AR1196–99, 1203, 1224, 1289, 1297, 1903, 1935–36(academics and Council members); AR1092–95, 1111–17, 1135(industry representatives). The preparers of the FMP concluded that studies of mobile gear's effects on other habitats were not sufficiently analogous and there was a complete lack of evidence to prove an identifiable adverse effect on tilefish habitat. AR1935(FMP stating that "none of the existing literature discusses or documents specific impacts to subterranean burrow communities such as those used by tilefish."); AR2515(Memo from Patricia Kurkul, Regional Administrator for the Nat'l Marine Fish. Serv. stating that "[t]he Council found that there is a paucity of information on the specific impact of trawling on tilefish burrows, with no evidence that tilefish burrows are being adversely impacted by trawling."); *see American Oceans Campaign v. Daley,* 183 F.Supp.2d 1, 11–17 (D.D.C.2000)("Since neither the statute nor the regulations requires the Councils to affirmatively conduct research to better identify [essential fish habitat] and the adverse effects of fishing on them, reliance on the best *available* scientific information is sufficient.").

Plaintiffs note that the final FMP states: "Unquestionably, from submersible vessel research, there are trawl door patterns observed in areas with tilefish burrows." AR1903. Plaintiffs claim that this observation constitutes per se evidence of physical disruption, Pl. Br. at 17, and that adverse effect may include a "physical disruption." 50 C.F.R. § 600.810(a). Thus, Plaintiffs contend, the Defendants missed an identifiable adverse effect. Defendants argue that door patterns do not prove physical disruption and, even if they did, Defendants' conclusion

---

**5.** This opinion refers to regulations in place at the time of the Defendants' action. *See Salazar–Paucar v. INS,* 281 F.3d 1069, 1074 n. 3 (9th Cir.2002); *accord Gregor v. Derwinski,* 911 F.Supp. 643, 652 (W.D.N.Y.1996)(applying regulations in place when plaintiff commenced the action).

was correct because there is no evidence of an impact that reduces "quality or quantity of essential fish habitat." *Id.* at § 600.18(a).

Record evidence indicates unequivocally that in hundreds of submersible dives, Dr. Able, a renowned expert on tilefish, observed bottom-tending mobile gear patterns in active twenty- to thirty-year old tilefish burrows. AR1198("These fish survived multiple annual trawling during the most intense time of fishing.... **We can safely postulate that trawling does not impact the local environment or food chain to the detriment of the Tilefish lifecycle.** This is a more reasonable hypothesis than the assumption that trawling does significantly impact the habitat or food chain to the detriment of Tilefish. Our hypothesis of low impact is based upon what we know from trawl surveys and from what has been observed during submersible dives, while the draft plan's assumptions of significant impact on the [essential fish habitat] has no direct evidence or basis other than pure conjecture." (emphasis added)). Based on these observations, Defendants reasonably found no evidence of a reduction in quality or quantity of essential fish habitat and did not deem "door marks" an identifiable adverse effect. The Court defers to the Defendants' expertise, which is supported by the record. *See American Oceans,* 183 F.Supp.2d at 11–12 (stating that a court must " 'look at the decision not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.' "); *see also Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

Plaintiffs' argument that Defendants' changed position from the draft FMP to the final FMP reflects Defendants' arbitrary decision-making process is unpersuasive. The record demonstrates that Defendants based the original inferred hypothesis on studies of other habitats, and that this hypothesis was, subsequently, called into question by Dr. Able, the fishing industry and the Council. AR1224(Dr. Tom Hoff, staff member of the Council testified: "[W]hat the technical team believed was that this was a reasonable inference.... However, there really is nothing known and what [Dr. Able] said and what the rest of us concluded was that there really is nothing definitively known on tilefish gear or on bottom tending gear impacting tilefish habitat, specifically that. We can make all the associations we want, but we don't have any direct evidence. There is nothing in the literature. He knows of nothing."). Defendants based their final conclusion upon the lack of any evidence of effects on tilefish habitat. AR1935("[N]one of the existing literature discusses or documents specific impacts to subterranean burrow communities such as those used by tilefish."); *see Muszynski,* 268 F.3d at 98 (" '[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer.' " (quoting *United States v. Mead Corp.,* 533 U.S. 218, 227–28, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001))).[6] Moreover, "an

---

**6.** It is often appropriate to change positions in resolving an issue, especially in response to public comment. *See Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 845, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986); *accord Ravenswood Group v. Fairmont Assocs.,* 736 F.Supp. 1285, 1288 (S.D.N.Y.1990)(" 'It goes without saying that a proposed regulation does not represent an agency's considered interpretation of its statute and that an agency is entitled to consider alternative interpretations before settling on the view it considers most sound.' ").

agency does not have a burden to explain a change in position from a proposed rule to the final rule, and ... a lack of an explanation for the change is not in itself evidence of arbitrariness." *Fed'n of Fly Fishers v. Daley,* 131 F.Supp.2d 1158, 1163 (N.D.Cal.2000).

Plaintiffs' arguments that Defendants declined to act without definitive proof, Pl. Br. at 11; that Defendants yielded to fishing industry pressure, Pl. Br. at 1; and that Defendants used the impracticability of implementing precautionary measures as an excuse to reverse their original hypothesis, Pl. Br. at 19, are equally unpersuasive. The record clearly supports Defendants' conclusion that no evidence existed that bottom-tending mobile gear caused an identifiable adverse impact upon tilefish. AR1297(Council member Bill Wells testified that "The fact is there is no evidence as to what mobile gear does. It's not that there isn't much. There isn't any.... We simply have no information to justify ... the proposals we went to public hearing with. We just had nothing."). At oral argument, in response to the Court's question whether there is evidence of an impact on tilefish habitat, Plaintiffs' counsel acknowledged that "there is no information [ ], besides inferences, based on the kind of evidence that the Council considered and that is in the record." *See* Transcript at 8–9 (Mar. 27, 2003). The Court finds that it was reasonable for Defendants not to impose new restrictions on bottom-tending mobile gear given the lack of evidence that the gear had an identifiable adverse effect. *See Evans,* 162 F.Supp.2d at 167 ("For a court to set aside the Secretary's decision as arbitrary and capricious, it must conclude that the administrative record is devoid of any justification for the action.").

#### (ii) Tilefish Environmental Impact Statement

The Nat'l Envtl. Policy Act requires that an Environmental Impact Statement include a "detailed statement" of "the environmental impact" of the proposed action. 42 U.S.C. § 4332(2)(C). The Envtl. Imp. Stmt. "should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14; *see Natural Res. Def. Council v. Callaway,* 524 F.2d 79, 92–93 (2d Cir.1975)(describing such analysis as "the linchpin of the entire impact statement").

Plaintiffs claim that Defendants failed to analyze the impact of the FMP's proposal, and refer for support to a May 3, 2001 Environmental Protection Agency letter critiquing the Envtl. Imp. Stmt. AR2481–83.[7] Nowhere is it suggested that the Envtl. Imp. Stmt. does not comply with the Nat'l Envtl. Policy Act or its regulations. AR2481 ("While the [Final Envtl. Imp. Stmt.] has improved, we still believe that the alternatives could have been more clearly defined. We do, however, note that the [Final Envtl. Imp. Stmt.] does offer a much better description of the environmental consequences of several of the non-preferred alternatives. The [Final Envtl. Imp. Stmt.] also has improved the discussion of the socio-economic composition of the groups that may be impacted by the proposed management measures."). As Defendants point out, Plaintiffs attempt

---

7. The May 3, 2001 Environmental Protection Agency letter reviewing and commenting on the final FMP expressed concern about the Envtl. Imp. Stmt., stating that the Agency "continue[s] to have environmental concerns that mitigation measures have not been adequately discussed." AR2481–82.

to equate an absence of data with a failure to analyze. Def. Br. at 20.

■ The Envtl. Imp. Stmt. states accurately that the impact of bottom-tending mobile gear on tilefish habitat is not known. AR1935("[N]one of the existing literature discusses or documents specific impacts to subterranean burrow communities such as those used by tilefish."). It indicates that the Mid–Atl. Fish. Mgmt. Council, the Nat'l Marine Fish. Serv., conservation organizations and the fishing industry intend to implement, within two years of the FMP, a research program to study the exact effects of bottom-tending mobile gear on tilefish habitat. AR1936–37. In addition, the Envtl. Imp. Stmt. discusses studies that show an adverse impact on other habitats, AR1933–36, on which the Defendants based their original inference, AR1935, and explains that these studies do not relate to tilefish habitat. AR1903("It was concluded that there is nothing definitively known about tilefish-mobile fishing gear interactions. There is nothing in the scientific literature."); *see also* AR1933–36. The Court finds the analysis of the impact of bottom-tending mobile gear on tilefish habitat is reasonable. *Accord Colorado Envtl. Coalition v. Dombeck,* 185 F.3d 1162, 1172 (10th Cir.1999)(finding an Envtl. Imp. Stmt. reasonable where it provided a "good faith presentation of the best information available under the circumstances.").

Plaintiffs also argue that Defendants violated a Council on Environmental Quality regulation that requires an agency either to obtain missing information or to include statements in the Envtl. Imp. Stmt. concerning the relevance and availability of the missing information, where there is incomplete or unavailable information pertaining to adverse effects. *See* 40 C.F.R. § 1502.22. In fact, Defendants included in the Envtl. Imp. Stmt. a statement that there was incomplete information, AR1936–37; they described the relevance of the information to reasonably foreseeable adverse impacts, AR1954–56, and the existing scientific evidence relevant to such impacts, AR1933–37; and they included an evaluation of such impacts. AR1937, 2064–65. The tilefish Envtl. Imp. Stmt. satisfies 40 C.F.R. § 1502.22.

Plaintiffs seem to fault the Defendants for including (only) three pages of alternatives analysis. Plaintiffs refer to a January 22, 2001 memo from the Director of Defendant Nat'l Marine Fish. Serv., one of the organizations that approved the Envtl. Imp. Stmt., Pl. Br. at Ex.A., which offers guidance for revising Envtl. Imp. Stmts. deemed incomplete—in a litigation in the District of Columbia. The significance of the January 22 memo in this case is unclear; in any event, the Court does not perceive that the Envtl. Imp. Stmt. fails to satisfy the approach described in the memo. The Envtl. Imp. Stmt. discusses—"in some detail," Pl. Br. at 22—four alternative approaches to habitat management, which were not implemented. AR2036–37. It discusses the impacts of adopting those measures, AR2064–65, and discusses the difficulty of analyzing effects in the absence of data. AR1933–37. It also discusses the need for additional research. AR1895, 1936–37, 1954–56.

The Court of Appeals for the Second Circuit has stated that the Nat'l Envtl. Policy Act does not require an agency to "make a 'crystal ball' inquiry." *Callaway,* 524 F.2d at 88. Rather, "an [Envtl. Imp. Stmt.] is required to furnish only such information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless or well nigh impossible." *Id.* (citation omitted); *see Dombeck,* 185 F.3d at 1172 (holding that a court need not "fly speck"

an Envtl. Imp. Stmt. or "give a hyper-technical reading of the regulations"; rather, it must examine "whether there is a reasonable, good faith, objective presentation of the topics."). The Envtl. Imp. Stmt. satisfies that standard and complies with the Nat'l Envtl. Policy Act.

## V. Conclusion

For the reasons stated herein, the Court denies Plaintiffs' motion for summary judgment and grants Defendants' cross motion for summary judgment. The Court respectfully requests that the Clerk close this case.